LEO FOX, ESQ. (LF-1947)
630 THIRD AVENUE, 18TH FLOOR
NEW YORK, NEW YORK 10017
(212) 867-9595
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

IN RE:

480 HUMBOLDT HOLDING, LLC,

Debtor.

-----------------------------------------------------------X

Chapter 11 Reorganization
Case No. 1-10-46402(JBR)

**DEBTOR'S REPLY TO
OBJECTIONS OF
CAPITAL ONE BANK
TO CASH COLLATERAL
USE**

TO:   HONORABLE JOEL B. ROSENTHAL
      UNITED STATES BANKRUPTCY JUDGE

The above Debtor by Leo Fox its attorney respectfully submits this Reply to the

Opposition of Capital One for the use of cash collateral.

1.   Pursuant to the Order of this Court dated July 12, 2010 authorizing the use of

Cash Collateral, the Debtor has used $10,000 of cash collateral to cover the expenses of

obtaining a Certificate of Occupancy and for the payment of the emergency items

referred to in the Court's Order. The Debtor has filed its schedules and also its monthly

operating reports, for the period July 7 - 31, 2010.

2.   The Debtor has paid $25,466 to Capital One, representing the excess of

rentals for the month of July, 2010 over the $10,000 amounts authorized to be used for

Cash Collateral.   The Debtor will also pay $20,500 to Capital One for August as

indicated infra.

3.   As is noted in the Debtor's Application to Use Cash Collateral (at Exhibit

"C"), the Debtor expects to collect approximately $51,000 in rent receipts for August,

2010 and in fact has collected and is holding approximately $50,000 in its accounts for August, 2010. The Debtor is prepared and is delivering an additional check to Capital One in the amount of $20,500 representing the excess of receipts over projected disbursements for August of $30,594 which includes such essential items as real estate taxes, elevator maintenance and other maintenance items, which have not been expended but which must be expended to maintain the operations of the Debtor's premises, and which the Debtor requests the Court to permit payment.

4.    The operations of the Debtor will reflect that there is $51,000 in receipts and there will be on-going operational expenses of no more than $15,000 per month consisting of approximately $8,000 to $9,000 per month plus the accrual of approximately $3,300 a month in the real estate tax which is being paid in August, 2010 and additional reorganization expenses (professional and United States Trustee Fees) for a total of approximately $15,000, per month, leaving available in excess of $35,000 per month to be paid to Capital One. As will be demonstrated below, these amounts are more than sufficient to pay debt service to Capital One in amounts originally contemplated under the various loan documents submitted by Capital One in connection with its Opposition.

## BACKGROUND

5.    On April 4, 2006, a two (2) year construction loan was entered into by 484 Humboldt Holding LLC for a borrowing facility of $8,500,000 with then North Fork Bank (later came to be known as Capital One Bank)(this loan was comprised of two components, a $1.5m Land Acquisition Loan evidenced by a Note dated April 4, 2006, which is attached as Exhibit A to the initial Opposition of Capital One to the Debtor's

Cash Collateral Application, and a $7m Construction Loan attached as Exhibit B to the Capital One original Opposition). These two loans accrued interest at an interest rate of 50 basis points above the prime lending rate.

6. Capital One obtained an appraisal dated May 8, 2008 (Exhibit "D") which valued the real property of the Debtor at 480 Humboldt Street at $11,000,000. (The real property is functioning as a completed rental building).

7. On or about November 2008, the Debtor acquired the real property with the consent of Capital One, as reflected on the Deed attached as Exhibit D to the Bank's original opposing papers. The loan for $8,500,000 provided for advances from lender to borrower throughout the construction phase upon review, inspection and approval by the bank's engineer. The loan was scheduled to mature on April 4, 2008. On May 2008, the loan was extended to October 4, 2008, with no changes in terms or conditions, including the interest rate.

8. North Fork was taken over by Capital One Bank. The Debtor and Capital One (the "Bank") signed an extension agreement from October 2008 to October 2009 (in the form of two six month extensions of October 2008 to March 2009 and March 2009 to October 2009, to be exercised at the option of the Debtor). On October 1, 2008, a new Term Sheet for an extension was sent out by Capital One Bank increasing the loan rate from 50 basis points over prime to 200 basis points over prime. The new extension additionally called for additional bank fees to be paid to Capital One ($41,250.00), which was paid by the Debtor. The Debtor executed the Extension Agreement and paid the $41,250.00.

9.     Despite the execution of the Extension Agreement by the Debtor, the Bank never returned an executed copy of the Agreement. Additionally, the Bank reduced the borrowing facility from $8,500,000.00 to $8,000,000.00 causing the Debtor to lose valuable working capital on the project, requiring the Debtor and its principals to raise additional funds towards the completion of the project, eliminated one of the six month extensions previously provided and required a Certificate of Occupancy ("C of O") to be obtained by the expiration of the first six month period or March, 2009. The Debtor requested that the deadline to obtain the TCO be extended to June 2009, based upon the Debtor's Architect's advice, which was refused by the Bank. In December 2008, the Bank demanded full and immediate payment of the loan.

10.     In January 2009, the Debtor commenced a lawsuit in the Supreme Court of New York against Capital One for declaratory judgment to determine the rights and liabilities of the Debtor. During this entire period, the Debtor continued to tender the interest payments to the Bank which were refused by the Bank. (This interest was subsequently paid at a higher rate as dictated by Capital One in March 2009.)

11.     In March 2009, the Bank demanded that the Debtor sign an extension up to June 2009, provided that the Debtor paid interest payments to Capital One of 200 basis points above prime, retroactive to October 4, 2008 up through February 28, 2009. Thereafter, the interest rate would run at 300 basis points over prime until June 1, 2009. This agreement, denominated the Second Note and Mortgage Modification and Extension Agreement ("Second Modification Agreement") was entered into on March 11, 2009 (Exhibit "E").

12.     This extension permitted the Debtor to obtain a permanent loan in June 2009 from Capital One at an interest rate of the 30-day LIBOR rate plus 300 basis points, for a period of five years, provided that the Debtor obtained a C of O by June 3, 2009 and paid a loan fee of 1% (see paragraph 6 of the Second Modification Agreement). The Debtor obtained a C of O prior to June 3, 2009 as evidenced by the attached (Exhibit "F"). All the interest which was due and the fees that were required to be paid as of June 3, 2009 had been paid. The Debtor informed the Bank of its determination to convert the debt to a permanent loan (Exhibit "G"). The LIBOR rate in June 2009 was .3162%, (Exhibit "H") resulting in the Bank having agreed in March 2009 to accept an interest factor of 3.3162% per annum, on the outstanding debt.

13.     The Bank refused to close on the Second Modification Agreement. In October 2009, Capital One compelled an extension (the Third Extension and Modification of Mortgage) that required enormous fees to be paid to Capital One and now had an interest rate of 400 basis points above prime up to January 2010 and thereafter at 8% assuming the Debtor received a 421A tax abatement by August 2010. The extension furthermore required a $500,000.00 equity payment and a lien on the real estate by a third party. The extension sought to eliminate a right to the Debtor to convert the construction loan to a long term loan.

14.     Meanwhile as a consequence of the difficult real estate climate, the Debtor experienced lost revenues (as a result of lower rents) and vacancies and incurred substantial expenses because of adverse real estate market.

15.     On or about January 22, 2010, Capital One commenced a Foreclosure Complaint in the New York State Supreme Court alleging that the mortgage was in

default and seeking a foreclosure judgment. The Debtor filed and Answer and interposed Counterclaims regarding the above actions of Capital One which the Debtor alleged resulted in substantial harm to the Debtor's estate. Capital One thereafter obtained the appointment ex parte of a Receiver on or about June 2010. The State Court thus never had the opportunity to review the merits of the Debtor's claims before appointing a receiver.

## THE DEBTOR SHOULD BE PERMITTED
## TO USE CASH COLLATERAL

16. The Mortgagee's claim that the Debtor may not continue to collect rent and pay expenses including the mortgage is wrong. New York Law deems rent assignments as only collateral and the Debtor continues to hold a property interest in future rents, which could be used to pay building expenses and mortgage payments In re: Constable Plaza Associates L.P., 125 B.R. 98 (Bkrtcy S.D.N.Y. 1991). Clearly the Debtor can operate on a Debtor-In Possession.

17. Moreover, the Assignment of Lease provisions (attached as Exhibit C to the Initial Opposition) specifically permits the Debtor to collect rents, does not impose an obligation upon the Mortgagee to collect rents (Paragraph 1, page 3) and requires the Mortgagee to apply all rents to the reduction of the debt (Paragraph 2, page3). While the Assignment Agreement appears to create "an absolute assignment" (Paragraph 2, page 4), the Agreement grants the Debtor a license which may only be revoked upon an event of default (Paragraph 3, page 4). Accordingly, this Assignment Agreement is clearly more in the nature of an assignment for the purposes of security than an absolute outright assignment, even by its terms.

18. During this entire time period as noted above the Debtor continued to pay the debt service required under the Agreement up until the Bank finally went beyond its prior rapacious demands and left the Debtor unable to continue to pay. Thus, the Debtor was fully current on the debt service until November 2009. During 2006 the Debtor paid $119,916, in 2007 the Debtor paid $350,476, in 2008 the Debtor paid $491,096, and in 2009 the Debtor paid $437,397 for a total of $1,398,885 in payments to the Bank during the course of the loan. The consequence of the vacancies of approximately half of the building premises, along with the excessive charges assessed by the Bank as well as the need for the Debtor's principles to raise additional funds because the Bank unilaterally reduced the financing commitments of North Fork resulted in an inability to continue to fund and pay on the mortgage. The real estate crash also resulted in an inability to quickly raise funds to meet the demand of the Bank.

19. Now that the Debtor has been able to re-rent the premises, and has been able to increase rents, it is clear that the Debtor will be able to proceed to assemble a package which provides for monthly payments to the Bank over a time period that pays the Bank market rate of interest and will allow the Debtor to retain the real property premises. Specifically the Debtor contemplates a five-year payment schedule at market rate of interest (which will be higher than the 3.3162% rate or prime plus one half point interest rate of the original mortgage the Bank agreed to accept) to the Bank which is payable from cash flow, with a balloon payment in the fifth year, paying the debt to the Bank in full. The Debtor will pay a fairly small distribution to the unsecured creditors, and the Debtor's principals intend to post funds to help achieve confirmation.

20. The Debtor thus can establish that it is capable of providing for a Chapter 11 Plan of Reorganization which can be confirmed under Section 1129 of the Bankruptcy Code. The available debt service is at least $35,000 which can be paid to the Bank

21. Capital One has not suggested that the Receiver should be reinstated. A creditor has the burden of proof under Section 543(d) to establish by a preponderance of the evidence that the interests of creditors and equity holders here could be better served by permitting the receiver to stay in possession, In re R&G Properties Inc., 2008 WL 4966774 (Bkrtcy D.Vt. 2008). The Debtor is entitled to a presumption that it should be entitled to remain in possession and control of its assets to attempt reorganization under Chapter 11, id.

22. There is sufficient income to fund a reorganization and further the property will be used by the Debtor for the purposes of protecting the interests of the creditors. The Debtor has demonstrated that only the Debtor could operate the business in a way that would generate "sufficient income to fund a successful reorganization." In re R&G Properties Inc., at 9.

WHEREFORE, the Debtor respectfully request that the Court grant the use of cash collateral and grant such other and further relief as is just.

Dated: New York, New York
      August 17, 2010                         Respectfully submitted,


                                   By: /s/Leo Fox
                                     Leo Fox (LF-1947)
                                     Attorney for Debtor
                                     630 Third Avenue, 18th Fl.
                                     New York, New York 10017
                                     (212) 867-9595

LEO FOX, ESQ. (LF-1947)
630 THIRD AVENUE, 18TH FLOOR
NEW YORK, NEW YORK 10017
(212) 867-9595

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IN RE:                                                    Case No. 10-46402
                                                          Chapter 11 Reorganization

480 HUMBOLDT HOLDING LLC,
                                                          AFFIDAVIT

                        Debtor.
-----------------------------------------------------------------X

STATE OF NEW YORK    )
COUNTY OF NEW YORK  )        ss.:


         SIMON WHITLEY, being duly sworn, deposes and says:

         I am a member of the above Debtor and I have reviewed the statement and information

contained in the annexed Reply and can confirm that the statements made therein are true to the best

of my knowledge.

                                                    Name: Simon Whitley
                                                    Title:  Member

Sworn to before me this
17th day of August, 2010.


NOTARY PUBLIC
LEO FOX
Notary Public, State of New York
No. 4699782
Qualified in New York County
Commission Expires December 31, 1993
                3/12/14

**EXHIBIT D**

APPRAISAL
IN A SUMMARY REPORT
OF REAL PROPERTY
APARTMENT BUILDING UNDER CONSTRUCTION
LOCATED AT
480 HUMBOLDT STREET
BROOKLYN, NEW YORK


BCS VALUATIONS, INC. FILE #2008-181


**PREPARED FOR**
RICKY CARIAS
CAPITAL ONE N.A.
265 BROAD HOLLOW ROAD
MELVILLE, NEW YORK  11747


**PREPARED BY**
BCS VALUATIONS, INC.
255 EXECUTIVE DRIVE
PLAINVIEW, NEW YORK  11803





# BCS Valuations, Inc.
### Real Estate Appraisal & Consulting Services

255 Executive Drive – Suite 205
Plainview, New York 11803
Phone: (516) 472-7400
Fax:    (516) 472-7401

May 9, 2008

Ricky Carias
Capital One N.A.
265 Broad Hollow Road
Melville, New York 11747

Dear Ricky Carias:

Attached is the appraisal, in a summary report format, of the property located at 480 Humboldt Street in Brooklyn, Kings County, City and State of New York. The subject property consists of a 9,155±-square-foot site that is currently in the advanced stages of being improved with a part 2- and part 12-story building containing a total of 20 apartments, 3,151± square feet of community facility office space, and 14 garage parking spaces. Upon completion, the subject's improvements will contain a gross building area above grade (inclusive of the first floor garage) of 31,445± square feet. The total rentable apartment and community facility office area will be 21,371± square feet.

Our report includes descriptions of the neighborhood and the subject property, followed by the logic employed in estimating value. The purpose of the appraisal is threefold, to estimate: (1) the market value of the fee simple interest of the subject property "As-Is", (2) the prospective market value of the fee simple interest of the building under construction upon completion assuming it is operated as a rental building, and (3) the prospective market value of the fee simple interest of the building under construction upon completion and stabilized occupancy assuming it is operated as a rental building. The report is in conformance with the appraisal requirements of the client, the Uniform Standards of Professional Appraisal Practice (USPAP), and FIRREA. The appraiser has the competency to appraise this type of property.

Market value, as utilized in this report, is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus.

(Continued)

BCS VALUATIONS, INC.
7-08

BCS FILE #2008-181 rev 5-

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

*1) Buyer and seller are typically motivated.*
*2) Both parties are well informed or well advised, and each acting in what he considers his own best interest*
*3) A reasonable time is allowed for exposure in the open market.*
*4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.*
*5) The price represents the normal consideration for the property sold unaffected by special financing or sale concessions granted by anyone associated with the sale.*

The date of valuation of the property "As Is" is the date of inspection, May 1, 2008. The date of valuation of the property assuming completion of the building under construction is the anticipated date of completion, July 1, 2008. The date of valuation of the property assuming completion of the building under construction and achieving a stabilized occupancy is January 1, 2009. Based upon the analysis contained in the attached report, subject to the contingent and limiting conditions, it is our opinion that the estimated market values of the subject property are as follows:

**(1)**
**AS IS MARKET VALUE**

**($9,300,000)**

**(2)**
**PROSPECTIVE MARKET VALUE ASSUMING COMPLETION OF CONSTRUCTION OF THE IMPROVEMENTS CURRENTLY UNDER CONSTRUCTION**

**($10,300,000)**

**(3)**
**PROSPECTIVE MARKET VALUE ASSUMING COMPLETION OF THE IMPROVEMENTS CURRENTLY UNDER CONSTRUCTION AND STABILIZED OPERATION AS A RENTAL**

**($11,000,000)**

Sincerely,

Brian McKeown
Vice President/Senior Appraiser
State of New York Certified General Real
Estate Appraiser Certificate #46000012062

Bruce Schwartz, MAI
President
State of New York Certified General Real
Estate Appraiser Certificate #46000002348

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................ 10
CERTIFICATE OF VALUE.................................................................................... 11
CONTINGENT & LIMITING CONDITIONS................................................... 13

## GENERAL INFORMATION

PURPOSE OF APPRAISAL................................................................................. 17
INTENDED USE OF APPRAISAL ................................................................... 17
SITE VISIT ............................................................................................................ 18
SCOPE OF APPRAISAL...................................................................................... 19
DEFINITION OF MARKET VALUE................................................................ 19
DEFINITION OF PROPERTY RIGHTS APPRAISED................................ 19

## DESCRIPTIONS

NEW YORK CITY ANALYSIS ......................................................................... 21
NEIGHBORHOOD DESCRIPTIONS............................................................. 35
MARKETING PERIOD....................................................................................... 45
EXPOSURE TIME................................................................................................. 46
SITE DESCRIPTION............................................................................................ 49
DESCRIPTION OF PROPOSED IMPROVEMENTS ................................. 56
OWNERSHIP, OCCUPANCY & HISTORY OF SUBJECT. ..................... 57
ZONING..................................................................................................................... 63
ASSESSMENT DATA AND REAL ESTATE TAXES.. ................................ 72
HIGHEST AND BEST USE ............................................................................... 72

## PROPERTY VALUATION

VALUATION PROCESS ...................................................................................... 76
COST APPROACH ............................................................................................... 79
INCOME CAPITALIZATION APPROACH ................................................. 94
AS-IS VALUATION ............................................................................................115
RECONCILIATION & FINAL VALUE ESTIMATES ...............................118

## ADDENDUM

EXHIBIT A: ENGAGEMENT LETTER
EXHIBIT B: CONSTRUCTION BUDGET
EXHIBIT C: QUALIFICATIONS OF THE APPRAISERS

## SUBJECT PROPERTY – FRONT OF 12-STORY BUILDING



## SUBJECT PROPERTY – REAR OF 12-STORY BUILDING



## SUBJECT PROPERTY – FRONT OF 2-STORY BUILDING



## SUBJECT PROPERTY – REAR OF 2-STORY BUILDING



## SUBJECT PROPERTY – FRONT OF 2-STORY BUILDING AND REAR OF 12-STORY BUILDING



## INTERIOR VIEW OF AN APARTMENT



## INTERIOR VIEW OF AN APARTMENT



## INTERIOR VIEW OF AN APARTMENT



## INTERIOR VIEW OF AN APARTMENT



## INTERIOR VIEW OF COMMUNITY FACILITY SPACE



## VIEW FROM AN UPPER FLOOR



## VIEW FROM AN UPPER FLOOR



## RICHARDSON STREET SCENE - EAST



## RICHARDSON STREET SCENE - WEST



## HUMBOLDT STREET SCENE - NORTH



## HUMBOLDT STREET SCENE - SOUTH



## LOCATION MAP



## EXECUTIVE SUMMARY

PROPERTY LOCATION:                480 Humboldt Street
                                 Brooklyn, New York

BLOCK/LOTS:                      2857/106

PROPOSED IMPROVEMENTS:           The improvements under construction will
                                 consist of a part 2- and part 12-story
                                 apartment building containing 20 units,
                                 3,151± square feet of community facility
                                 office space, and 14 garage parking spaces.
                                 Upon completion, the building will contain a
                                 gross area above grade (inclusive of the first
                                 floor garage) of 31,445± square feet and a
                                 total saleable/rentable area of 21,371± square
                                 feet.

LOT SIZE:                        9,155± Square Feet

ZONING:                          R6

REAL ESTATE TAXES:
  CURRENT:                       $6,486
  PROJECTED UPON COMPLETION:     $102,386 (Assuming reassessment but prior
                                 to any tax abatement/exemption)

HIGHEST AND BEST USE:

  As if Vacant:                  Residential and office development
  As it Presently Exists:        Residential and office development

FINAL VALUE ESTIMATES:

| | |
|---|---|
| 1) AS IS: | $ 9,300,000 |
| 2) UPON COMPLETION: | $10,300,000 |
| 3) UPON STABILIZATED OCCUPANCY: | $11,000,000 |

PROPERTY RIGHTS APPRAISED:       Fee simple

DATES OF VALUATION:              May 1, 2008 (As Is)
                                 July 1, 2008 (Upon Completion of
                                 Construction)
                                 January 1, 2009 (Upon Completion of
                                 Construction and Stabilized Occupancy)

## CERTIFICATION

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results. The estimate of Market Value in the appraisal report is not based in whole or in part upon the race, color, or national origin of the prospective owners or occupants of the property appraised, or upon the race, color, or national origin of the present owners or occupants of the properties in the vicinity of the property appraised.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the *Uniform Standards of Professional Appraisal Practice*.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- I have made a personal inspection of portions of the property that is the subject of this report.

- All contingent and limiting conditions are contained herein (imposed by the terms of the assignment or by the undersigned affecting the analyses, opinions, and conclusions contained in the report).

- No one provided significant real property appraisal assistance to the person signing this certification.

- As of the date of this report, Bruce Schwartz, MAI has completed the continuing education program of the Appraisal Institute.

Date: May 9, 2008

Appraiser (s)

Brian McKeown (Inspected Subject Property)
Vice President/Senior Appraiser
State of New York Certified General Real Estate Appraiser
Certificate #46000012062

Bruce Schwartz, MAI (Did Not Inspect Subject Property)
President
State of New York Certified General Real Estate Appraiser
Certificate #46000002348

# CONTINGENT AND LIMITING CONDITIONS

The certification of the appraiser appearing in this appraisal report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the appraiser in the report.

1) The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership.

2) Any sketch in the report may show approximate dimensions and is included to assist the reader in visualizing the property. The appraiser has made no survey of the property.

3) The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made therefor.

4) Any distribution of the valuation in the report between land and improvements applies only under the existing program of utilization. The separate valuations of land and building must not be used in conjunction with any other appraisal and are invalid if so used.

5) The appraiser assumes that there are no hidden or inapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraiser assumes no responsibility for such conditions, or for engineering which might be required to discover such factors.

6) Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser can be assumed by the appraiser.

7) Disclosure of the contents of the appraisal report is governed by the Bylaws and Regulations of the professional appraisal organization with which the appraiser is affiliated.

8) Neither all, nor any part of the content of the report or copy thereof (including conclusions as to the property value, the identity of the Appraiser, professional designations, reference to any professional appraisal organizations, or the firm with which the Appraiser is connected), shall be used for any purposes by anyone but the client specified in the report, the borrower if appraisal fee paid by same, the mortgagee or its successors and assigns, mortgage insurers, consultants, professional appraisal organizations, any state or federally approved financial institution, any department, agency, or instrumentality of the United States or any state or the District of Columbia, without the previous written consent of the Appraiser; nor shall it be conveyed by anyone in the public through advertising, public relations, news, sales, or other media, without the written consent and approval of the Appraiser.

9) On all appraisals, subject to satisfactory completion, repairs, or alterations, the appraisal report and value conclusion are contingent upon completion of the improvements in a workmanlike manner.

10) Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

11) Unless otherwise stated, our value estimates assume a normal marketing period of not more than one year.

12) The Americans with Disabilities Act (ADA), became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative affect on the value of the property.

13) We have not been provided with any information pertaining to the existence of lead paint in the subject property. The presence of such material could result in potential liability and expenditures. Our value conclusions assume that no such materials are present in the subject property.

14) While the appraiser did observe portions of the subject property during the scope of the assignment the site visit is not intended to represent a property inspection which would and/or should be made by a qualified professional such as a property inspector or engineer. As such the appraiser makes no representations or warranties as to the integrity of any building components and unless otherwise stated within this report, the scope of the appraisal assignment assumes that there are no such defects or adverse conditions associated with any component of the improvements. This report cannot be relied upon to disclose condition and/or property defects.

15) If the word inspection appears anywhere within this report it should be construed as meaning a site visit. As stated in the scope of this assignment, this report cannot be considered a property inspection.

16) Prospective value opinions, along with available factual data, are intended to reflect the current expectations and perceptions of market participants. They should be judged on the support for the forecasts that existed when made, not on whether specific items in the forecasts are realized at a later date.

17) The appraisers' estimates of the prospective market values upon completion of the proposed construction are based on the current market conditions from which the prospective value opinion was made. The appraiser cannot be held responsible for unforeseeable events that alter market conditions prior to the effective date of the appraisal.

18) The appraisal assumes that the subject property is granted a 421A tax exemption as projected and utilized in our analysis.

# GENERAL INFORMATION

## PURPOSE OF THE APPRAISAL

The purpose of the appraisal is threefold, to estimate: (1) the market value of the fee simple interest of the subject property "As-Is", (2) the prospective market value of the fee simple interest of the building under construction upon completion assuming it is operated as a rental building, and (3) the prospective market value of the fee simple interest of the building under construction upon completion and stabilized occupancy assuming it is operated as a rental building.

The "As-Is" date of value is the date of inspection, May 1, 2008. The prospective market value upon completion of construction is as of the anticipated date of completion, July 1, 2008. The date of valuation of the property assuming completion of the building under construction and achieving a stabilized occupancy is January 1, 2009.

Non-realty items have not been valued.

## INTENDED USE/USER OF THE APPRAISAL

The intended use of this appraisal, as we understand it, is for mortgage financing purposes. The intended user is the client as listed on the cover of this report.

## SITE VISIT

The subject property was visited on May 1, 2008 by Brian McKeown, who was accompanied by Simon Whitley, a representative of the current owner, and Thomas J. Capobianco, Vice President of Commercial Real Estate for Capital One Bank.

# SCOPE OF THE APPRAISAL

The market values contained within this report were derived from the appraisers' research and analysis of market data and information obtained from municipal officials. Our research included an analysis of the subject's region and neighborhood, a visit to the subject property, a review of local zoning regulations and tax data, a determination of the highest and best use of the property, and valuation using the appropriate valuation methodology.

In obtaining comparable sales and rental data, public records, real estate brokers, property owners, and other appraisers are typically utilized. Whenever possible, the information contained in our report is verified. Verification, however, cannot always be made. By utilizing a wide sample of data, the effects of any unknown factor related to market data is hoped to be minimized.

While the appraiser did observe portions of the subject property, the site visit is not intended to represent a property inspection which would generally be made by a qualified professional such as a property inspector or engineer. The purpose of the site visit is to assist the appraiser in the appraisal process. The appraiser makes no representations or warranties as to the integrity of any building components and unless otherwise stated within this report the scope of the appraisal assignment assumes that there are no defects or adverse conditions associated with any component of the improvements. This report cannot be relied upon to disclose adverse building conditions and/or property defects.

# DEFINITION OF MARKET VALUE

Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

*1) Buyer and seller are typically motivated.*
*2) Both parties are well informed or well advised, and each acting in what he considers his own best interest.*
*3) A reasonable time is allowed for exposure in the open market.*
*4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto.*
*5) The price represents the normal consideration for the property sold unaffected by special financing or sale concessions granted by anyone associated with the sale.* [1]

# DEFINITION OF PROSPECTIVE VALUE ESTIMATE

*A forecast of the value expected at a specific future date.* [2]

# DEFINITION OF PROPERTY RIGHTS APPRAISED

The property is appraised on the basis of a fee simple estate.

**Fee simple**: *Absolute ownership unencumbered by any other interest or estate subject only to the four powers of government.* [3]

[1] Uniform Standards of Professional Appraisal Practice.
[2] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, Fourth Edition (Chicago: Appraisal Institute, 2002): 239.
[3] *The Dictionary of Real Estate Appraisal*, 113.